# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  21-mj-2170 |
| Storage unit 386, located at Life Storage, 801 East Commercial Street, Los Angeles, California 90012, as more fully described in Attachment A-1 | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Controlled Substances |
| 21 U.S.C. § 846 | Conspiracy and Attempt to Distribute Controlled Substances |
| 18 U.S.C. § 924(c) | Carrying a Firearm During and in Relation to, and Possessing a Firearm in Furtherance of, a Drug Trafficking Crime |
| 18 U.S.C. § 922(g) | Felon in Possession of a Firearm and Ammunition |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

*/s/ Michael F. Sier*

_____
*Applicant's signature*

Michael F. Sier, DEA Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and state: Los Angeles, CA _____

_____
*Judge's signature*

The Honorable Michael R. Wilner
_____
*Printed name and title*

AUSA:  Andrew M. Roach (213-894-0306)

## ATTACHMENT A-1

PREMISES TO BE SEARCHED

    The premises of storage unit 386, located at Life Storage, 801 East Commercial Street, Los Angeles, California 90012 ("SUBJECT PREMISES 1").  The unit is believed to approximately 10 feet by 20 feet in dimension and is believed to be rented by Rickey Harger.

**ATTACHMENT B**

## I.  ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Controlled Substances), 21 U.S.C. § 846 (Conspiracy and Attempt to Distribute Controlled Substances), 18 U.S.C. § 924(c) (Carrying a Firearm During and in Relation to, and Possessing a Firearm in Furtherance of, a Drug Trafficking Crime), and 18 U.S.C. § 922(g) (Felon in Possession of a Firearm and Ammunition) (the "Subject Offenses"), namely:

a.   Any controlled substance, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.   Firearms and ammunition;

d.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

e.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks,

traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

f.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

g.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

h.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written

communications sent to or received from any of the digital devices and which relate to the above-named violations;

i.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

j.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs, firearms, or ammunition;

k.   Contents of any calendar or date book;

l.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

m.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

n.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

          ii.   evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,
as well as evidence of the presence or absence of security
software designed to detect malicious software;

          iii. evidence of the attachment of other devices;

          iv.   evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

          v.    evidence of the times the device was used;

          vi.   passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

          vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

          viii.    records of or information about
Internet Protocol addresses used by the device;

          ix.   records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  <u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or

seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

x

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## **AFFIDAVIT**

I, Michael F. Sier, being duly sworn, declare and state as follows:

### **I. PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of an application for a warrant to search:

a.   The premises of storage unit 386, located at Life Storage, 801 East Commercial Street, Los Angeles, California 90012 ("SUBJECT PREMISES 1"), which is believed to be RICKEY HARGER'S ("HARGER") storage unit, as more fully described in Attachment A-1; and

b.   The premises of storage unit 327, located at Life Storage, 801 East Commercial Street, Los Angeles, California 90012 ("SUBJECT PREMISES 2"), which is believed to be BUDDY FRANCIS DOUGLAS's ("DOUGLAS") storage unit, as more fully described in Attachment A-2.

2.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Controlled Substances), 21 U.S.C. § 846 (Conspiracy and Attempt to Distribute Controlled Substances), 18 U.S.C. § 924(c) (Carrying a Firearm During and in Relation to, and Possessing a Firearm in Furtherance of, a Drug Trafficking Crime), and 18 U.S.C. § 922(g) (Felon in Possession of a Firearm and Ammunition) (the "Subject Offenses"), as described more fully in Attachment B.   Attachments A-1 and A-2 are incorporated herein by reference.

3.   The facts set forth in this affidavit are based upon my training and experience and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

4.   I am a Special Agent of the United States Drug Enforcement Administration ("DEA").  I have been employed as a Special Agent with the DEA since September of 2012 and am currently assigned to the Los Angeles Field Division, Sensitive Investigations Unit.  I attended approximately four-and-a-half months of training at the DEA Training Academy in Quantico, Virginia starting in May 2012, where I received training in criminal law and procedure, surveillance operations, search warrant and report writing, undercover operations, confidential source management, money laundering and asset forfeiture, and specialized training concerning crimes in violations of the Controlled Substances Act contained within Title 21 of the United States Code and criminal conspiracies involving the smuggling and distribution of narcotics and dangerous drugs. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the

collection of monetary proceeds of narcotics trafficking.  I am familiar with the unlawful importation, possession with the intent to distribute, and distribution of controlled substances, as well as the related monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics.  I have also received training on, and worked on several investigations involving, narcotics-related money laundering organizations.

5.    In conducting major narcotics and money laundering investigations, I have become aware of many techniques utilized by narcotics traffickers and money launderers.  I have learned that these individuals utilize various tactics to avoid detection and/or apprehension by law enforcement officials.  Techniques used by members of these organizations include the use of multiple locations, utilizations of numerous co-conspirators, the use of pagers, pay telephones, cellular telephones, cellular phone applications and software, and the use of hidden compartments in vehicles.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.    Since December 2019, Santa Monica Police Department ("SMPD"), Special Investigations Unit, has been investigating BUDDY FRANCIS DOUGLAS ("DOUGLAS"), a convicted felon and suspected dealer of large quantities of heroin, methamphetamine, cocaine, and fentanyl in Los Angeles.  As part of the investigation, in January 2020, a confidential source working with SMPD—Confidential Source 1 ("CS 1")—purchased fentanyl from DOUGLAS at an apartment in downtown Los Angeles, which

3

DOUGLAS was using as a place of operations for his drug
business.  Following that purchase, CS-1 visited DOUGLAS at this
drug house and another drug house controlled by DOUGLAS in
Hollywood on multiple occasions.  During these visits, CS-1
observed DOUGLAS and his associates dealing in kilogram-
quantities of drugs at both locations.

    7.   In February 2020, local law enforcement executed a
state search warrant at the Hollywood Apartment.  DOUGLAS,
HARGER, and several other individuals were arrested during the
search.  Officers seized approximately 18 pounds of
methamphetamine, a kilogram of cocaine, a kilogram of heroin,
and a kilogram of fentanyl, in addition to three handguns and
$12,000 in cash.  The Los Angeles District Attorney's Office
ultimately declined to file charges against DOUGLAS, HARGER, or
the other individuals.

    8.   Following the search on the Hollywood Apartment, CS-1
continued to communicate with DOUGLAS and learned that DOUGLAS
was still selling drugs.  DOUGLAS had changed his behavior
following the search on the Hollywood Apartment and had
relocated his operations to a new drug house in downtown Los
Angeles, located at 560 South Main Street, Apartment 10S, Los
Angeles, California 90013 (the "Main Street Apartment"), in an
apparent attempt to keep his drug business separate from
DOUGLAS's actual residence, located at 625 North 4th Street,
Montebello, California 90640 ("DOUGLAS'S Home").  CS-1 also
learned that DOUGLAS would no longer handle final delivery of
drugs, leaving that to HARGER or others.

9.   On November 17, 2020, at SMPD's direction, CS-1 negotiated the purchase of two ounces of methamphetamine from HARGER and DOUGLAS for the next day at the Main Street Apartment.  The following day, CS-1 met a different one of DOUGLAS's associates, GILBERTO SAMUEL CASTRO ("CASTRO"), at the Main Street Apartment.  During their initial encounter, CASTRO pointed a firearm at CS-1 and questioned CS-1 about his bona fides as they were discussing price.  Ultimately, CASTRO calmed down and provided CS-1 with two ounces of suspected methamphetamine.

10.  Moreover, in addition to the controlled buy, CS-1 and a second confidential source—-Confidential Source 2 ("CS-2")—-observed drugs at the Main Street Apartment on multiple occasions between October and November 2020.

11.  On February 23, 2021, the Honorable Jacqueline Chooljian issued federal search warrants for the Main Street Apartment, DOUGLAS'S Home, and two cars belonging to DOUGLAS. See Case Nos. 21-MJ-899, 901, 902, and 903.

12.  On February 24, 2021, agents executed the search warrants at the Main Street Apartment, DOUGLAS'S Home, and on DOUGLAS's vehicles.

13.  During the search of the Main Street Apartment, agents found gram quantities of various drugs.  No one was present during the search.  Agents later learned information that caused them to believe that the occupant(s) moved out following a reported gunshot at the apartment a few days before the search.

14.   During the search at DOUGLAS'S Home, agents found a .32-caliber, Walther 32 PPK semi-automatic handgun in a handbag.  Inside the handbag and along with the handgun, agents found a fully-loaded magazine with .32 ammunition and a plastic container of .22 caliber ammunition.  Agents also found $20,193 in cash in the same room where the gun and ammunition was located.  During the search, DOUGLAS's wife and minor son said the gun was DOUGLAS's, however, DOUGLAS stated that he got the gun for his wife for her protection.

15.   DOUGLAS was subsequently arrested and charged on a complaint alleging a violation of 18 U.S.C. § 922(g) (Felon in Possession of a Firearm).  <u>See</u> Case No. 2:21-CR-00110-SB. DOUGLAS was ordered detained.

16.   As part of the ongoing investigation, I reviewed recorded jail calls between DOUGLAS and HARGER from between March 3 and March 21, 2021.  During those jail calls, DOUGLAS and HARGER discussed the collection of suspected drug debts and also referenced storage units, the SUBJECT PREMISES, that were located near the Metropolitan Detention Center ("MDC").

17.   My subsequent investigation determined that HARGER and DOUGLAS rented two storage units, the SUBJECT PREMISES, near MDC, which appear to be associated with drug sale activity.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

18.   Based on my review of law enforcement reports, my conversations with other law enforcement officers, and my own participation in the investigation, I know the following:

A.    SMPD's Initial Investigation into DOUGLAS

19.    In mid-December 2019, an individual in custody offered to provide SMPD with information regarding a local drug dealer in exchange for consideration of the reduction of criminal charges.  The individual agreed to cooperate with law enforcement and was subsequently signed up as a confidential source, Confidential Source 1 ("CS-1").[1]  CS-1 provided the name and phone number of DOUGLAS, who CS-1 indicated was selling drugs.

B.    CS-1 Purchases Fentanyl from DOUGLAS in December 2019

20.    On December 31, 2019, at the direction and under the supervision of SMPD, CS-1 made a controlled purchase of approximately one gram of suspected fentanyl from DOUGLAS at one of DOUGLAS's suspected drug houses, located on Flower Street in downtown Los Angeles (the "Flower Street Apartment").  While CS-1 was inside the apartment, the CS-1 reported seeing approximately one to two kilograms of drugs, which CS-1 believed to be fentanyl.  In addition, CS-1 reported seeing three other individuals inside the apartment picking up drugs at the time.

---

[1] CS-1 cooperated with law enforcement in exchange for consideration in criminal charges from a prior arrest for driving under the influence and possession of a controlled substance.  CS-1 has a criminal history which includes possession of a controlled substance, carrying a concealed weapon, possession of a controlled substance while armed, felon in possession of a stun gun, and possession of a controlled substance for sale.  CS-1 has a positive cooperative history which has led to seizures and arrests, with the exception of CS-1's purchase of a gram of cocaine from CASTRO, at CASTRO's insistence, during the controlled buy.  This purchase of a gram of cocaine was not at the direction of law enforcement. According to the CS, the CS purchased the cocaine, at CASTRO's insistence, to avoid suspicion.  The CS-1 voluntarily disclosed this purchase to law enforcement, as discussed further below.

21. During subsequent communications with DOUGLAS, CS-1 learned that DOUGLAS also had another apartment in Hollywood that DOUGLAS also used as a place to sell drugs, located on Vine Street in Hollywood (the "Hollywood Apartment").

22. During December 2019 and January 2020, CS-1 visited DOUGLAS at both the Flower Street and Hollywood Apartments on multiple occasions.  During these visits, CS-1 repeatedly saw large amounts of drugs-—in quantities ranging from approximately one to five kilograms of what CS-1 believed to fentanyl and methamphetamine--at both locations.[2]  CS-1 provided SMPD with photographs of some of the drugs that CS-1 saw inside of both of DOUGLAS's drug houses.

**C.   SMPD and LAPD Execute a Search Warrant at the Hollywood Apartment in February 2020**

23. On February 4, 2020, a SMPD detective investigating DOUGLAS received a telephone call from a Los Angeles Police Department High Intensity Drug Trafficking Area ("LAPD HIDTA") team officer.  The officer advised SMPD that an LAPD informant had observed firearms in the Hollywood Apartment and that LAPD planned to seek a search warrant on the Hollywood Apartment. The SMPD detective, who had already drafted a search warrant affidavit based on the December 2019 controlled purchase, advised LAPD of SMPD's pending search warrant.  The SMPD detective applied for the search warrant later that day.  The

---

[2] With the exception of the controlled purchase on December 31, 2020, law enforcement did not specifically direct CS-1 to visit the two drug houses during this two-month period.  CS-1 would, however, share the information he learned with SMPD.

Honorable Norman Tarle, Superior Court Judge of Los Angeles
County Superior Court, signed the search warrant for the
Hollywood Apartment later that day.

24.   SMPD and LAPD executed the search of the Hollywood
Apartment on the night of February 4, 2020.  During the search,
SMPD and LAPD HIDTA taskforce officers seized approximately
18 pounds of methamphetamine, a kilogram of cocaine, a kilogram
of heroin, a kilogram of fentanyl, along with three handguns
inside the common area of the apartment.  They also seized
approximately $12,000 in U.S. currency.

25.   Approximately four individuals, including DOUGLAS and
HARGER, were present at the Hollywood Apartment during the
execution of the search.  Law enforcement arrested DOUGLAS,
HARGER, and the others.

26.   From what I understand, based on my conversations with
law enforcement officers, LAPD presented charges against
DOUGLAS, HARGER, and the others to the Los Angeles District
Attorney's Office.  The District Attorney's Office declined to
file charges.

D.   **Following His Arrest, DOUGLAS Continued to Traffic Drugs
at the Main Street Apartment**

27.   Several months after DOUGLAS's arrest, CS-1 advised
SMPD that DOUGLAS and CS-1 were still in communication.[3]  CS-1
relayed to SMPD, in part, that DOUGLAS informed CS-1 that he was

---

[3] After the search of the Hollywood Drug House,
investigating SMPD detectives were redeployed on various COVID
and civil disturbance issues.  During this time, detectives were
in contact with the CS-1, but the pandemic prevented further
investigatory action on this matter.

no longer operating from his prior drug houses, the Flower
Street and Hollywood Apartments.  DOUGLAS told CS-1 that he was
still selling drugs and was now operating out of a new downtown
location that he acquired to conduct business, located at 560
Main Street, Apartment 10S, Los Angeles, California 90013 (the
"Main Street Apartment").  DOUGLAS explained to CS-1 that he
moved drug houses because law enforcement became aware of his
drug trafficking at the prior drug houses, as well as the fact
that he had been evicted from one of the drug houses.  During
their conversations, DOUGLAS also informed CS-1 that DOUGLAS
would negotiate and discuss drug deals and prices, but final
delivery of any purchased drugs would be handled by his business
partner, HARGER, at the Main Street Apartment.

28.  Later on, on October 6, 2020, under SMPD supervision,
CS-1 conducted an audio recorded meeting with DOUGLAS in the
lobby of the building of the Main Street Apartment.  During this
recorded conversation, DOUGLAS and CS-1 talked about firearms.
They also discussed the price of fentanyl and alprazolam; but
CS-1 did not enter the Main Street Apartment on this occasion.

**E.   A Second Confidential Source Sees DOUGLAS with Drugs at
the Main Street Apartment**

29.  On October 1, 2020, a second SMPD Confidential Source
("CS-2") informed SMPD that CS-2 previously purchased fentanyl
from DOUGLAS several times within the past six months at the
Main Street Apartment.[4]  These purchases occurred before CS-2

---

[4] CS-2 cooperated with law enforcement for the consideration
of dismissal of drug-sale charges.  CS-2 has a criminal history
*(footnote cont'd on next page)*

agreed to cooperate with law enforcement.  CS-2 further stated
that CS-2 had been inside the Main Street Apartment on multiple
occasions in the prior months, where CS-2 observed kilogram-
quantities of drugs divided up into gallon-size Ziploc bags and
large plastic containers.  CS-2 stated that some of containers
were stashed inside a black cabinet in the living room of the
Main Street Apartment.

30.  After agreeing to cooperate with law enforcement, on
October 2, 2020, CS-2 went to the Main Street Apartment to meet
with DOUGLAS and HARGER.  This visit was not at the direction of
SMPD; rather, at the time, CS-2 was paying a social visit on
DOUGLAS and HARGER in the apparent hopes of getting information
to provide SMPD.  While inside the Main Street Apartment, HARGER
showed CS-2 approximately two kilograms of a substance that
HARGER identified as fentanyl.  Shortly after, CS-2 reported
that DOUGLAS arrived with a gallon-size Ziploc bag filled with a
substance that DOUGLAS identified as fentanyl.  During this
encounter, CS-2 took several pictures of various drugs and
paraphernalia which CS-2 later provided to SMPD.

### F.   CS-1 Makes a Controlled Buy from DOUGLAS and CASTRO at the Main Street Apartment

31.  On November 17, 2020, at SMPD's direction, CS-1
called DOUGLAS to arrange the purchase of two ounces of

---

which includes grand theft, receiving stolen property, grand
theft auto, assault with a deadly weapon, possession of a
controlled substance, burglary, robbery, and possession of a
controlled substance for sale.  CS-2 has a positive cooperative
history and has provided information to law enforcement which
law enforcement has been able to corroborate independently.

methamphetamine for $350 for the following day.  During the
call, DOUGLAS agreed to sell CS-1 two ounces of methamphetamine
for $350.  DOUGLAS directed CS-1 to call his partner, HARGER, to
make arrangements.  CS-1 then contacted HARGER who told CS-1 to
call him the next day to make final arrangements.

32.  The following day, November 18, 2020, CS-1 was unable
to contact DOUGLAS or HARGER.  Law enforcement and CS-1,
however, continued with their plan to conduct a video-recorded,
controlled buy.  SMPD met CS-1 and provided CS-1 with $350 to
purchase two ounces of methamphetamine.  CS-1 was also outfitted
with a video recording device which CS-1 wore during the
controlled buy.  Under the supervision of law enforcement, CS-1
then drove to the Main Street Apartment, where CS-1 knocked on
the door of the Main Street Apartment several times.

33.  According to CS-1, after CS-1 knocked on the door for
several minutes, a man who CS-1 knew as "Chino," and whom law
enforcement later determined to be CASTRO, arrived at the front
door of the Main Street Apartment and unlocked it.[5]  CS-1 told
CASTRO that CS-1 was looking for HARGER.  CASTRO told CS-1 he
was not there and to return in 20 minutes.  CS-1 left and
returned to the Main Street Apartment approximately 20 minutes
later.  By that time, two other people, a man and a woman, were
waiting in the hallway outside the Main Street Apartment.  While

---

[5] Although CS-1 knew CASTRO as "Chino," and CS-1 had seen
him in passing at DOUGLAS's Downtown Drug House earlier in the
year, this was the first time CS-1 had sustained interactions
with CASTRO.  Following the controlled purchase, CS-1 provided
Chino's social media information to law enforcement, which
allowed law enforcement to identify him as CASTRO.

talking with these people in the hallway, CS-1 learned that they were also looking for HARGER to obtain resupplies of drugs.

34.  CS-1 proceeded to knock on the door of the Main Street Apartment.  CASTRO answered and let CS-1 inside the apartment. Once inside, they discussed the deal that CS-1 had previously agreed to with DOUGLAS and HARGER the day before, namely the price.  While discussing the price, CASTRO questioned CS-1's bona fides and pointed a handgun at CS-1's head.  CS-1 then attempted to calm CASTRO down.  After calming CASTRO down, CS-1 asked CASTRO to call DOUGLAS to confirm the deal.  CASTRO then called DOUGLAS and handed the phone to CS-1, who spoke with DOUGLAS on the phone and reminded him of their agreed-upon deal. CS-1 then handed the phone back to CASTRO, who spoke to DOUGLAS further.  DOUGLAS then told CASTRO to sell CS-1 two ounces of methamphetamine.  DOUGLAS also told CASTRO to make sure CS-1 picked up a gram of cocaine that CS-1 had previously asked about several months earlier.[6]

35.  CASTRO prepared a package with suspected methamphetamine and handed it to CS-1 in exchange for payment. CASTRO then handed CS-1 a small sample of cocaine per DOUGLAS's direction.  While inside the apartment, CS-1 observed that there were additional amounts of suspected drugs in addition to the handgun that CASTRO previously pointed at CS-1.  CS-1 then left the apartment after getting CASTRO's phone number.

---

[6] CS-1 had previously asked DOUGLAS about cocaine to see if was still selling drugs to provide information to SMPD.

36.   After leaving the Main Street Apartment, CS-1 met SMPD
detectives at a prearranged location.  SMPD detectives collected
approximately 74 grams of suspected methamphetamine, including
the packaging weight, which CS-1 had purchased from CASTRO.  A
DEA laboratory later tested the methamphetamine and determined
the amount to be approximately 66.08 grams of actual
methamphetamine.

37.   When CS-1 met SMPD detectives at the prearranged
location, the focus of the brief conversation was primarily how
CASTRO pointed a handgun at CS-1 and whether CS-1 was ok.  SMPD
did not ask any other specific questions about the deal.  This,
in part, was because SMPD had been monitoring the controlled
purchase through a live audio transmitter on CS-1 during the
transaction.  At the time, however, SMPD was not aware of CS-1's
purchase of the small sample of cocaine as CS-1's live audio
transmitter briefly cut out during this part of the deal.

38.   The following day, before SMPD detectives watched the
video of the controlled buy, CS-1 contacted detectives and
advised them that CS-1 had also obtained a gram of cocaine in
addition to the methamphetamine that SMPD directed CS-1 to
purchase.  CS-1 told detectives that CS-1 forgot to mention it
to SMPD immediately after the controlled purchase because CS-1
was overwhelmed after having had a gun pointed at CS-1.  CS-1
explained that CS-1 accepted the gram of cocaine, at CASTRO's
and DOUGLAS's insistence, out of fear for his safety, as CASTRO
had just pointed a gun at his head, and because CS-1 had to in
order to not look suspicious as CS-1 had previously been asking

DOUGLAS about cocaine months earlier in the hopes of learning information for SMPD. CS-1 told SMPD that CS-1 had disposed of the cocaine sample and did not use it.

39. Later that day, SMPD reviewed the surveillance video of the controlled purchase and saw the two ounces of methamphetamine and the gram of cocaine that CS-1 purchased. SMPD detectives also saw CASTRO holding a handgun in the video, however, due to the position of the recording device, detectives could not see if CASTRO pointed the gun at CS-1. SMPD officers did, however, hear CS-1 make statements on the video to the effect of "come on, bro" and "you don't need the gun."

40. SMPD detectives later reviewed CASTRO's phone records from November 18, 2020. The records confirm that a call from DOUGLAS's phone number, ending in 4702, called the phone number CASTRO provided to CS-1 as being CASTRO's phone number, ending in 4556, at approximately 5:29 p.m. This timestamp corresponds to the time CS-1 was inside the Main Street Apartment and talking to CASTRO while DOUGLAS was on the phone. During this call, CS-1 is heard talking to a person suspected to be DOUGLAS, specifically referring to him by his nickname on the call.

G.   **The Confidential Sources Discuss Future Drug Sales with DOUGLAS and CASTRO**

41. Following the controlled purchase, both CS-1 and CS-2 continued to have communications with both CASTRO and DOUGLAS regarding the purchase of additional drugs.

42. Additionally, on December 9, 2020, CS-2 communicated via a recorded phone call with DOUGLAS. CS-2 asked DOUGLAS if

he had any "clear," which based on my training and experience, is slang for methamphetamine, for sale.  DOUGLAS responded that he did not have "clear," but could get CS-2 cocaine for $1350 an ounce.  DOUGLAS advised that he would have to make some phone calls to get CS-2 "clear."  DOUGLAS advised that his "clear guys" would only sell 10 ounces at a time and DOUGLAS could get 10 ounces for $2000 to $2100.  DOUGLAS advised that "who I set you up with, can get you everything you ask for."  DOUGLAS informed CS-2 that the last time he bought "clear," DOUGLAS purchased 26 ounces and was down to his last four ounces.  DOUGLAS further advised that he was purchasing 10 ounces of methamphetamine for significantly less, as most people are paying $2600 to $2900 for the same amount.  DOUGLAS told CS-2 that "clear is a good one, it always sells."

43.  Moreover, on January 31 and February 1, 2021, CS-2 had additional recorded calls with DOUGLAS where they discussed purchases of methamphetamine.  Specifically, during a conversation on January 31, 2021, CS-2 asked DOUGLAS, "What's your price?"  DOUGLAS replied, "Well you're looking at about 28 right now," which DOUGLAS indicated was not a bad price.  The following day, on February 1, 2021, CS-2 had a follow-up recorded conversation with DOUGLAS.  CS-2 indicated he was "ready" to proceed with his purchase.  During the call, CS-2 asked about purchasing "clear."  DOUGLAS indicated that he would check on his supplies and he might not be able to get the "clear" for CS-2 until the following morning.

**H.   Law Enforcement Executes a Search Warrant on the Main Street Apartment and DOUGLAS's Home**

44.   On February 23, 2021, the Honorable Jacqueline Chooljian issued federal search warrants for the Main Street Apartment, DOUGLAS'S Home, and two cars belonging to DOUGLAS. See Case Nos. 21-MJ-899, 901, 902, and 903.

45.   On the morning of February 24, 2021, law enforcement executed the search warrants at the Main Street Apartment and DOUGLAS'S Home.

46.   During the search of the Main Street Apartment, no one was present.  Law enforcement seized gram-level quantities of suspected methamphetamine, cocaine, marijuana, and multiple rounds of different types of ammunition, including .223 caliber, 40mm, 9mm, shotgun shells, and .22 caliber ammunition.  Law enforcement believed that occupants recently moved out of the Main Street Apartment following a reported gunshot in the apartment a few days before the search.

47.   During the search of DOUGLAS'S Home, DOUGLAS's wife informed agents that there was a gun and ammunition inside a handbag in the front bedroom.  Law enforcement then located the handbag, a Louis Vuitton handbag with a handwritten price tag still attached to it, on the bed in the bedroom.  DOUGLAS's wife told agents that she had purchased the Louis Vuitton handbag, however, the items in it were not hers.  Relevant here, law enforcement previously observed DOUGLAS wearing a Louis Vuitton handbag during prior surveillance, but law enforcement had not seen DOUGLAS carrying this particular handbag before.

48.  Inside the bag, agents seized an unloaded .32-caliber, Walther 32 PPK semi-automatic handgun, bearing serial number 386557K, a fully-loaded magazine with .32 caliber ammunition separate from the handgun, and a plastic container with multiple rounds of .22 caliber ammunition.  During the search, both DOUGLAS's wife and his minor son stated that the gun belonged to DOUGLAS.  DOUGLAS, however, denied ownership of the gun. DOUGLAS stated that he got the gun for his wife for her protection.  In the same room as the handbag were other items appearing to belong to DOUGLAS, including men's clothing, shoes, personal items, and a bag full of paperwork in DOUGLAS's name. A dresser was located near the bed where the handbag was located.  Underneath the dresser, law enforcement found a clear gallon-sized plastic bag that contained $20,193 in cash.

49.  Agents subsequently arrested DOUGLAS for being a felon in possession of a firearm.

**I.   DOUGLAS is Arrested on a Complaint and Detained**

50.  On February 24, 2021, the Honorable Charles F. Eick signed a complaint against DOUGLAS for a violation of 18 U.S.C. § 922(g) (Felon in Possession of a Firearm).  See Case No. 2:21-cr-00110-SB, Dkt. 1.

51.  On February 25, 2021, DOUGLAS had his initial appearance before the Honorable Jacqueline Chooljian.  Judge Chooljian ordered DOUGLAS detained.  See id., Dkt. 8.

52.  DOUGLAS was subsequently indicted for a violation of 18 U.S.C. § 922(g) (Felon in Possession of a Firearm) on March 9, 2021.  See id., Dkt. 12.

**J.   Subsequent Jail Calls Show DOUGLAS and HARGER Discussing Drug Debts and Two Storage Units in Downtown Los Angeles**

53.   Following DOUGLAS's detention, I and SMPD Detective Marilyn Amiache continued to investigate DOUGLAS and HARGER for drug trafficking.  As part of our investigation, I obtained DOUGLAS's calls from the Metropolitan Detention Center ("MDC") from March 3 through 24, 2021 through an administrative subpoena.

54.   Detective Marilyn Amiache and I listened to these recordings.  Each of these calls began with a warning that the call was being recorded and is subject to monitoring.  In the calls, DOUGLAS called multiple people, including his wife, G.R.; his son; and HARGER.  During his conversations with them, DOUGLAS told all three where and who to collect money from and he identified individuals who owe him money.  Based on my training and experience and knowledge of the investigation, including DOUGLAS and HARGER's previous joint drug trafficking, I believe these references to debts were for suspected drug debts.

55.   The following summarizes a portion of the recorded jail calls between March 3, 2021 and March 24, 2021.

a.   On March 4, 2021, DOUGLAS called his wife, G.R., and reassured her that they had money.  DOUGLAS told his wife he had "three hundred and one" in a bank account and another "two hundred and fifty" in another bank in downtown Los Angeles. Based on my training and experience, I know that drug traffickers often discuss dollar values in code to deter

19

detection from law enforcement.  As such, I believe that "three hundred and one" and "two hundred and fifty" is a reference to $301,000 and $250,000 dollars, respectively.

b.   On March 13, 2021, DOUGLAS advised G.R. that there was an unidentified male who lives at an apartment at 6th and Spring in downtown Los Angeles, who owed DOUGLAS a large amount of money.  There was also a discussion about selling other items to obtain more cash.

c.   On March 16, 2021, DOUGLAS discussed with G.R. the federal search warrant executed at the Main Street Apartment.  G.R. asked why HARGER was not arrested.  DOUGLAS responded that he did not understand why either.

d.   On March 17, 2021, DOUGLAS spoke to HARGER. During the call, DOUGLAS instructed HARGER to not tell DOUGLAS's other son anything.  DOUGLAS also told HARGER to drop off money at his house for his wife.

e.   On March 17, 2021, DOUGLAS called his son.  In the call, he advised his son to collect "50 dollars" from an unidentified individual.  DOUGLAS also said that this person could give his him approximately "4 grand" a week.  DOUGLAS said the individual was located at a residence next to a Wienerschnitzel in Montebello and DOUGLAS described the location so that his son could pick up the funds.  Based on my training and experience, I believe "50 dollars" is a reference to $50,000.

f.   On March 18, 2021, DOUGLAS called G.R.  During that call, DOUGLAS instructed G.R. not to spend all the money

they had.  DOUGLAS reminded G.R. how they just came back from a great vacation and that it was soured by the execution of the federal search warrant.  DOUGLAS told her, "Babe, that's why I don't want you knowing nothing about me.  You understand why I do this to you."

g.   On March 22, 2021, DOUGLAS called HARGER.  During the call, DOUGLAS told HARGER that he could see Alameda Street "between first and where our . . . our thing is" from his location at MDC.  HARGER responded, in part, by stating this was close to where their storage units were located.  DOUGLAS replied yes, but that he could not see down that side of the street.  During this conversation, DOUGLAS also told HARGER that he needed to contact an individual named "Victor" who owed him money.  DOUGLAS also stated that he would call HARGER later and that when he does he would need him to send something somewhere. HARGER responded that he would do so.

h.   On another call on the same date, DOUGLAS asked HARGER if he was still good with "dumb and dumber" and told him to tell them that he needed some money.  They further discussed additional debts they were owed.

i.   On March 23, 2021, DOUGLAS had a call with his son.  During this call, his son told DOUGLAS that he put himself in prison by associating with the wrong tweakers.  His son proceeded to described how DOUGLAS would "pull up and drop stuff off."  Based on my training and experience and knowledge of this investigation, I believe that DOUGLAS's son was referring to DOUGLAS's method of drug distribution.

**K.    Investigation into DOUGLAS's and HARGER's Storage Units
       (the SUBJECT PREMISES)**

56.  Following our review of the jail calls, Detective
Amiache searched for storage facilities near MDC.  She
identified Life Storage at 801 East Commercial Street, which is
approximately half of a mile from MDC, where DOUGLAS is
currently housed.

57.  On April 12, 2021, I spoke with an employee at the
Life Storage facility who identified himself as F.R.  F.R.
stated that an individual named "Rickey Harger" is currently
renting SUBJECT PREMISES 1, a "10 x 20" storage unit, which was
rented on January 2, 2021.  F.R. said that the last four digits
of the renter's driver's license on file is 5797.  A check of
law enforcement databases confirms that HARGER's California
driver's license number ends in 5797, which matches the last
four digits on file at Life Storage for SUBJECT PREMISES 1.

58.  F.R. also stated that DOUGLAS is currently renting
SUBJECT PREMISES 2, a "10 x 5" storage unit, which was rented on
August 25, 2020.  F.R. said that the last four digits of the
renter's driver's license on file is 3425.  A check of law
enforcement databases confirms that DOUGLAS's California
driver's license number ends in 3425, which matches the last
four digits on file at Life Storage for SUBJECT PREMISES 2. F.R.
indicated that both HARGER and DOUGLAS were late on rental
payments for SUBJECT PREMISES 1 and 2 but the units were still
in their possession.

59.  F.R. also provided phone numbers for both units. Specifically, F.R. gave a number of 714-328-0245 for the unit believed to be rented to HARGER (SUBJECT PREMISES 1).  Based on a review of law enforcement databases, this number was registered to HARGER in the past.  F.R. also gave a number of 323-689-6704 for the unit rented to DOUGLAS (SUBJECT PREMISES 2).  This number is the same number that CS-1 provided to Detective Amiache in October 2020 as DOUGLAS's number.  A review of law enforcement databases shows that this number is registered to DOUGLAS's wife, G.R.

60.  Based on the recorded conversations regarding suspected drug money between DOUGLAS, HARGER and others, I believe that that DOUGLAS and HARGER are still engaged in drug trafficking.  I also believe that DOUGLAS is still involved in criminal activity, because DOUGLAS has asked friends and family to collect money owed to him by various individuals for suspected drug transactions.  DOUGLAS has also continued to show his partnership with HARGER as he directs HARGER to collect money on his behalf.

61.  Further, based on my training and experience, I know that it is common for criminals, specifically narcotics dealers, to rent storage units to store contraband and evidence related to their drug dealing activities.  The purpose of this is to prevent law enforcement from locating money, weapons, contraband or other fruits and/or instrumentalities of criminal activity.

62.  Based on the investigation, I believe that DOUGLAS kept his primary residence free of evidence of his participation

of a drug trafficking conspiracy to deter detection from law enforcement.  Indeed, during the investigation, law enforcement noticed that DOUGLAS never provided his customers or any confidential source the address of his actual residence.  For example, on one occasion, DOUGLAS even told CS-1 that he lived in "Montebello" and that was his home and where his wife and kids lived.  DOUGLAS implied that he kept it free of drugs for that reason.[7]

63.  I also believe it is possible that after the local policed executed the search warrant at the Hollywood Apartment in February 2020, HARGER and DOUGLAS obtained these storage units to further conceal evidence of their criminal activity.

## V.  <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

64.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

---

[7] During the course of the investigation, SMPD learned that DOUGLAS and/or his associates rented the prior Downtown and Hollywood Drug Houses under different identities, apparently in an attempt to disclaim association and to evade detection from law enforcement.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale, and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences, vehicles, storage units, and stash houses.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence, vehicles, storage units, and stash houses.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences, vehicles, storage units, or stash houses.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence, storage units, or stash houses, or in safes.  They also often keep other items related to their drug trafficking activities at their residence, vehicles, storage units, and stash houses, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

i.   It is common for drug traffickers to own or maintain firearms in close proximity to their drugs or drug proceeds in order to protect their drugs and money.

j.   It is also common for drug traffickers to maintain alternate locations, including storage units, lockers, and other locations, to store contraband and evidence of their drug-dealing activities, in order to avoid detection by law enforcement.

## VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

65.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residences, vehicles, storage units, and stash houses, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These

photographs and recordings are often shared via social media, text messages, and over text messaging applications.

        c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

## VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[8]

66.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[8] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remains on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

67.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

68.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.     CONCLUSION

69.  For all of the reasons described above, there is probable cause to believe that the items to be seized described in Attachment B will be found in a search of SUBJECT PREMISES 1 and SUBJECT PREMISES 2, as described in Attachments A-1 and A-2.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 30th day of
April, 2021.


_____
THE HONORABLE MICHAEL R. WILNER
UNITED STATES MAGISTRATE JUDGE

31